IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

REBECCA EDWARDS,                    )
                                    )
     Plaintiff,                     )
                                    )
v.                                  )        No. 22-cv-02682-TMP
                                    )
SHELBY COUNTY, TENNESSEE,           )
a Tennessee municipality            )
operating as the SHELBY COUNTY      )
HEALTH DEPARTMENT,                  )
                                    )
     Defendant.                     )

---

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

---

Before the court is defendant Shelby County's Motion for Summary Judgment, filed on March 5, 2024.[1] (ECF No. 38.) For the reasons below, the motion is GRANTED in part and DENIED in part.

## I.   FINDINGS OF FACT

### A.   Edwards's Job

Rebecca Edwards was hired by the Shelby County Health Department ("SCHD") as a "Contact Tracer Health Investigator" on August 3, 2020. (ECF No. 38-3 at PageID 187 (July 17, 2020 Employment Letter).) The hire letter Edwards received upon accepting this position stated, "This position is funded by the

---

[1]The parties have consented to having the undersigned conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings. (ECF No. 13.)

federal CARES Act. The funding for this grant is expected to end on December 30, 2020." (Id.) Edwards applied for and received a promotion to be an "Environmentalist Contact Tracer Inspector," effective December 16, 2020. (ECF No. 38-4 at PageID 190 (Dec. 1, 2020 Employment Letter).) The December 1, 2020 hire letter for this new position stated that it was a "durational appointed position" and that it was "not a Civil Service Merit System classified position." (Id.) The letter also stated that "[s]hould this durational position end, you will have no right to reinstatement to your current position." (Id.) Edwards signed this hire letter on December 2, 2020. (Id. at PageID 191.) The job description also stated that the position assumed by Edwards was grant-funded and durational. (ECF No. 38-9 at PageID 386 (Job Description).) Edwards held this position from December 16, 2020, until her termination. (ECF No. 38-1 at PageID 165-66; ECF No. 42-1 at PageID 442-43.)

**B.   Edwards's Termination**

Edwards was diagnosed with asthma in 2018 and has since carried a rescue BREO inhaler with her. (ECF No. 43-4 at PageID 593-94 (Dep. of Rebecca Edwards, Vol. I).) When her asthma flares up, she has difficulty performing household tasks and maintaining conversation. (Id. at PageID 594.) Edwards testified that her asthma would flare up at the smell of marijuana and smoke, explaining that, "[e]ven if I have my BREO and all is

well, if someone were to walk in here right now with marijuana or smoke, then we got issues." (<u>Id.</u> at PageID 595.) She also suffers from night blindness. (<u>Id.</u> at PageID 592.) This means that Edwards tries not to drive at night, limiting any night driving to "within a three-mile radius" of her house, taking back streets, and avoiding highways or any streets with "blinding light." (<u>Id.</u>)

At the time of her promotion, in December 2020, Edwards underwent a medical screening exam to verify that she was physically able to perform the job. (<u>Id.</u> at PageID 590–92.) During the exam, Edwards did not disclose that she had issues with breathing. (<u>Id.</u>) On a medical form, the doctor performing the exam checked the boxes that stated Edwards "[m]ay work without limitations/restrictions" and she was "[a]ble to perform job-related functions defined by Shelby County Government." (<u>Id.</u> at PageID 591–92.) The doctor performed a Titmus test and an Ishihara test for Edwards's vision. (<u>Id.</u>) Edwards's vision was tested at 20/15 for distance vision and 20/20 for near vision. (<u>Id.</u>) Edwards was neither asked about nor tested for night vision issues, but she also did not report any. (<u>Id.</u>) Edwards had not been informed that driving alone past 11:30 p.m. could be a part of the job. (ECF No. 43-5 at PageID 614–15 (Dep. of Rebecca Edwards, Vol. II).)

During Edwards's employment between August 2021, and October 8, 2021, she reported to Susie Suttle, the manager of the COVID Response Unit. (ECF No. 43-4 at PageID 579, 583; ECF No. 43-6 at PageID 660 (Dep. of Susie Suttle).) Edwards testified that, on September 15, 2021, she "had not taken the BREO in a while, . . . was having breathing issues, . . . was coughing, . . . was wheezing, and . . . had not slept." (ECF No. 43-5 at PageID 624.) Edwards did not have her BREO inhaler because it was out of stock, and her symptoms were made worse by changes in air pressure. (Id.) Edwards called Suttle's office phone at 4:00 a.m. and left a message referencing her asthma directly and stating: "I'm having breathing issues. I haven't been able to sleep. I'm coughing, and I won't be coming in." (Id.) Edwards testified that Suttle called her back around 7:30 a.m., insisted that Edwards needed to meet her at Walmart to "get this child seat" because Suttle no longer had "time to get anybody, and Nick can't handle this family of eight by himself." (Id. at 625.) Edwards reiterated that her asthma was causing her breathing difficulties on the 7:30 a.m. call with Suttle. (Id.) On that phone call, Edwards agreed to go to work and did, in fact, work on September 15, 2021. (Id.; ECF No. 22 at PageID 88 (Amended Complaint); ECF No. 24 at PageID 115 (Answer to Amended Complaint).)

Edwards testified that on October 4, 2021, Suttle created a new shift from 3:00 p.m. to 11:30 p.m. at the Econo Lodge Lakeland ("Econo Lodge") and assigned it to Edwards. (ECF No. 22 at PageID 91.) During their conversation about this change, Edwards stated she could not work that shift because she was worried about criminal activity in the area and concerned about driving twenty miles at night because she suffers from nyctalopia, or night blindness. (ECF No. 43-5 at PageID 629.) According to Edwards, Suttle responded first by saying "You can drive at night. It's no problem. You've driven at night before. You can drive at night[,]" before agreeing to talk to Deputy Administrator Jennifer Kmet, but nevertheless said that Edwards would have to work the shift until told otherwise. (Id. at PageID 629-30.) Edwards stated that she would get a doctor's statement confirming her night blindness condition. (ECF No. 43-4 at PageID 589; ECF No. 43-6 at PageID 684-85.) Edwards testified that either that day or the next, she called her optometrist and her pulmonologist in order to get statements, though both were off that day and did not respond. (ECF No. 43-4 at PageID 589.) Edwards claims she never received any follow-up questions about a doctor's note or her condition from anyone else at SCHD. (ECF No. 43-5 at PageID 635.)

The morning of October 5, 2021, Suttle called Edwards several times to confirm that Edwards did not intend to work the

entire 3:00 p.m. to 11:30 p.m. shift. (ECF No. 22 at PageID 92; ECF No. 24 at PageID 119.) Edwards informed Suttle that she would report to her shift but would do so "under protest." (ECF No. 43-5 at PageID 630.) At 4:07 p.m. on October 5, Edwards emailed Suttle and Kmet that she would work at the Econo Lodge that day and October 6, but "under protest" and noted criminal activities at the Econo Lodge, including a specific criminal incident she witnessed on September 13, 2021. (ECF No. 43-20 at PageID 756-57.)

Before Edwards's shift began, and before Edwards sent the 4:07 p.m. email, Suttle spoke with Kmet to discuss Edwards's objections to the nighttime shift and whether an alternative schedule could be arranged. (ECF No. 43-19 at PageID 743-44 (Rule 30(b)(6) Dep. of Jennifer Kmet).) In that conversation, Suttle also complained about Edwards's absenteeism and insubordination, for which Kmet advised her to provide documentation. (Id.) Kmet also agreed to change Edwards's hours so that her shift could end at 7:00 p.m. (Id. at PageID 744.) Suttle did not inform Edwards about this change on October 5. (ECF No. 43-5 at PageID 631.) At 11:45 a.m. on October 5, 2021, after their conversation but before Edwards's shift was set to begin, Suttle emailed Kmet a report for the purpose of removing Edwards as one of Suttle's specialist employees. (ECF No. 43-8

at PageID 715 (Suttle Report Email); ECF No. 43-6 at PageID 683.) Suttle's October 5, 2021 report stated the following:

Rebecca Edwards' Behavior

In the month of August, there were several occasions that I met Ms. Thomas at the Waffle House to purchase breakfast and Ms. Edwards was not there. At that time, the shift started at 8:00 am. I assisted Ms. Thomas with loading the breakfast in my vehicle and transported it over to the Econo Lodge. Ms. Edwards showed up after 9:30 am.

09/20/2021 Ms. Edwards was instructed to report to the Dividend location to assist with updating the data spreadsheet for the patients at the Econo Lodge. She was instructed to work from 8:00 am to 4:30 pm at the Dividend location due to her inconsistently at the Econo Lodge. Ms. Edwards informed me that she had a doctor's appointment. She left at 9:00 am. She was instructed to return to the office after her doctor's appointment. Ms. Edwards did not show back up to the office until after 4:00 pm. She did not follow instructions provided to complete the spreadsheet. I am in the process of finalizing that spreadsheet now.

09/21/2021 Ms. Edwards was to report to work at 8:00 am. She did not show up to Dividend until 4:09 pm. I met her in the hallway. I am not sure what she worked on but I was here until approximately 7:30 pm. I went to where she normally sits before I left for the evening. She was not there, so I am not sure what time she left.

10/04/2021 Ms. Edwards reported to the Dividend location. She has been on vacation from 09/23/2021 through October 03, 2021. She completed the FEMA training but did not do anything else all day. She left the office before 4:00 pm and didn't go out to the Econo Lodge at all. I spoke to Ms. Edwards earlier and explained to her again that I called her back into the office due to her behavior at the Econo Lodge. She was expected to complete date entry but she has not. Therefore, I am requesting her to report back to the Econo Lodge. I explained that she is expected to work from 3:00 pm to 11:30 pm to take care of the patients

- 7 -

at the Econo Lodge. Ms. Edwards stated that she could not work at the Econo Lodge until 11:30 pm. I explained to Ms. Edwards that those are the shifts they agreed to work. Ms. Edwards states that she did not agree to any shift. She stated that she cannot drive from the Econo Lodge at night and that she has a doctor's statement. I informed Ms. Edwards that maybe the shifts can be adjusted but allow me to speak to Jennifer first. I informed her that she would need to work that shift until I get back to her or work something out with the other two staff. Ms. Edwards never said anything else about the shift. She did not assist with meal delivery during her shift on yesterday.

10/05/2021 I followed up with Ms. Edwards this morning to discuss her not assisting with meal delivery on yesterday. Ms. Edwards stated again that she is not going to work at the Econo Lodge until 11:30 pm. She states that she can assist with lunch and dinner but that she cannot drive from the Econo Lodge at night. I informed Ms. Edwards that there is only one patient at the Econo Lodge right now and that she is basically monitoring to make sure that the patient's needs are being met. She stated again that she will assist with lunch and dinner but that she is not driving from the Econo Lodge at night. So, I asked her was she refusing to work her shift? She stated that she has a doctor's statement. I asked her what does her doctor's statement say? She then stated that she did not have a doctor's statement but she will get one. Ms. Edwards went on to say that there is prostitution and a known drug dealer on the Econo Lodge property. She stated that a bounty hunter came on the property to look for someone.

(ECF No. 43-8 at PageID 716–17.) No person in Human Resources, including Laviette Crutchfield, the Senior Human Resources Manager, assisted or consulted with Suttle in creating this report. (ECF No. 43-2 at PageID 497 (Dep. of Laviette Crutchfield).)

Edwards began her assigned shift at the Econo Lodge on October 5, but left sometime between 8:00 p.m. and 8:30 p.m. because she did not feel safe driving home later. (ECF No. 43-5 at PageID 631.) On October 6, 2021, Suttle called Edwards to inform her that Edwards had been moved to an earlier shift starting at 10:30 a.m., and it was to begin that day. (ECF No. 43-4 at PageID 587.) Edwards testified that she received this call after 10:30 a.m., and Suttle said "I know this is late. Get there when you can." (Id.) Edwards was scheduled for a COVID-19 test that day, and so did not get out to the Econo Lodge until "a little after 1:30[.]" (Id.) She testified that she stayed until after 7:00 p.m. (Id.)

That day, at 1:53 p.m., Suttle emailed a second report to Kmet, which largely restated the October 5 report, with a few additions. (ECF No. 43-7 at PageID 712-14 (Suttle Updated Report Email Chain.) She added the following:

> There was a complaint from Community Healthcare that Ms. Edwards gave patients in transport water and asked them to take their masks off to drink the water while in transport. The workers complained that they were being exposed to COVID-19 due to Ms. Edwards asking the patients to take off their masks.
>
> . . .
>
> 10/05/2021 Ms. Edwards's shift starts at 3:00 pm. She called the other staff around 3:15 pm and informed him that I asked him not to order dinner and that she was going to order dinner. I never instructed her to tell him the employer that.

> 10/06/2021 Ms. Edwards was contacted this morning around 10:30 am and informed that her shift has been changed temporarily. She was instructed to report to the Econo Lodge after getting dressed and that she will work from 10:30 am to 7:30 pm. I checked with the Environmentalist currently on duty at 1:30 pm and Ms. Edwards still has not arrived at the Econo Lodge. I called Mr. Patel to see whether or not he has seen or talked with Ms. Edwards. He states that she has not arrived.

(Id. at PageID 713–14.)

On October 7, 2021, at 9:33 a.m., Administrator of Epidemiology Cassandra Brown emailed Suttle, instructing her to "document your investigation into Rebecca's allegations and the modification made to her schedule (which includes security coverage) to accommodate her. Can you please respond to Rebecca and copy me and Jennifer [Kmet]." (ECF No. 43-21 at PageID 758 (Brown email).) Kmet forwarded Suttle's updated report to Brown eleven minutes later, stating "FYI — I haven't reviewed yet." (ECF No. 43-7 at PageID 712.) At 9:51 a.m., Brown e-mailed Crutchfield, attaching Suttle's updated report listing her allegations against Edwards, asking to "please let us know steps to initiate a disciplinary process if allowable. There is a pattern of refusing to follow directives." (Id.) After Brown's email, Suttle received four statements total, three from Edwards's coworkers and one from the Econo Lodge's manager or owner, Mr. Patel.

Velma Thomas, an Environmental Specialist who was under Suttle's supervision along with Edwards, emailed Suttle at 7:33 p.m. on October 7, stating she had "never witnessed any criminal activities at the EconoLoge [sic] in Lakeland, TN." (ECF No. 43-22 at PageID 759 (Thomas email); ECF No. 43-6 at PageID 661.) Thomas also stated: "When it comes to my colleague (Rebecca Edwards) regarding the delivery of morning meals, she usually showed up well after 9:00 am on several occasions and by then, the morning meals have already been delivered." (ECF No. 43-22 at PageID 759.) Patel, in an email sent on October 7 at 8:27 p.m., stated that the hotel monitors the room rented out to the county, and that "[w]e do have the sheriffs department come through the property on a routine basis and if any suspicious activity is noticed we notify them." (ECF No. 43-23 at PageID 760 (Patel email).) The following day, Suttle received emails from two other employees stating they had not witnessed any criminal activity at the Econo Lodge on September 29, 2021, and October 6, 2021. (ECF No. 43-24 at PageID 761 (Broom email); ECF No. 43-25 at PageID 762 (Blasingame email).)[2]

_____

[2]Edwards disputes that there were no safety concerns at the Econo Lodge. She asserts that on August 17, 2021, at an Inspector Assignment meeting in which Edwards, Suttle, and other management were present, Suttle stated that County employees working at Econo Lodge "should be male and female at all times because you never know what you're going to run into," and, "I think you should go in twos[.]" (ECF No. 43-5 at PageID 616; ECF No. 43-6 at PageID 664.) On September 7, 2021, a Care

Edwards was not informed that she was under investigation prior to leaving work for her scheduled leave on October 7, 2021. (ECF No. 43-5 at PageID 635, 637.) At 8:52 a.m. on October 8, 2021, Crutchfield emailed Brown and Kmet, informing them that Edwards would be terminated because of "Acts of Insubordination; Attendance; Falsification of Information." (ECF No. 43-9 at PageID 718 (Crutchfield Oct. 8 email).) That day, Edwards asserts that Suttle called her and asked that Edwards come into the office the morning of October 11, 2021, but did not explain why. (ECF No. 43-5 at PageID 637.) On October 11, 2021, Edwards met with Suttle and Brown. (Id. at PageID 638; ECF No. 43-6 at PageID 693.) In the meeting, Edwards was walked through the Disciplinary Action Form ("DAF"). (ECF No. 43-5 at PageID 638; ECF No. 43-6 at PageID 693.) Although Suttle asserts that Brown read from the DAF, (ECF No. 43-6 at PageID 693), Edwards insists that it was Suttle who read the document. (ECF No. 43-5 at PageID 638).

The DAF states:

---

Coordination meeting took place that included Deputy Director Travis Green, Brown, Kmet, Suttle, and Edwards in which Edwards stated that there were criminal activities occurring at the Econo Lodge, such as drug dealing and prostitution. (ECF No. 22 at PageID 86; ECF No. 24 at PageID 114.) At that meeting, Green stated his intention to end the contract with Econo Lodge and arranged for security to be present at Econo Lodge for the following two weeks. (ECF No. 22 at PageID 87; ECF No. 24 at PageID 115.)

Based on information from Ms. Susie Suttle, the direct supervisor of Ms. Edwards: A complaint was received from Community Healthcare, the transportation provider for the CRU, stating that Ms. Edwards gave water to COVID positive patients and asked them to take their masks off to drink the water while in transport, which is a violation of COVID-19 protocols and the Shelby County Health Directive. 09/20/2021 - Ms. Edwards was instructed to report to the COVID-19 Response Unit (CRU) at [REDACTED] from 8:00 am to 4:30 pm, due to her inconsistency in reporting to the SCHD Shelter Facility Site (Econo Lodge, Lakeland, TN) as directed. Ms. Edwards was reassigned to perform data entry. Ms. Edwards stated she had a doctor's appointment; left at 9:00 am and did not return until after 4:00 pm. Ms. Edwards did not submit leave. Subsequently, Ms. Edwards did not complete data entry tasks. 09/21/2021 Ms. Edwards did not report to the CRU until 4:09 pm. Prior to Mrs. Suttle leaving the CRU at 7:30, she went to Ms. Edward's work station and she was not there. It is unclear what time Ms. Edwards left for the evening. 10/04/2021 Ms. Edwards reported to the CRU, but did not perform data entry tasks as assigned beginning 9/20/2021. She left work early at 4:00 pm. Due to Ms. Edwards inability to complete these tasks, she was reassigned to case management and client monitoring on-site at the SCHD shelter facility from 3:00 pm to 11:30 pm. Ms. Edwards refused to work this shift and cited several reasons why, which were later found to be untrue after being investigated by Ms. Suttle, and obtaining witness statements from Community Healthcare, the Econo Lodge, and other Environmentalists also assigned to the shelter facility. Mrs. Edwards did not report to work. 10/05/2021 On follow up with Ms. Edwards regarding her not assisting with meal delivery on 10/4/2021, Ms. Edwards stated again she is not going to work at the Econo Lodge until 11:30 pm. 10/06/202 In an effort to accommodate Ms. Edwards and in response to her complaint, she was allowed to work 10:30 to 7:00 pm with security present. According to another environmentalist on duty and the hotel owner, at 1:30 pm Ms. Edwards had not arrived.

(ECF No. 43-27 at PageID 764-65 (DAF).) Despite initial disagreement,[3] the parties agree that Edwards was terminated effective October 8, 2021. (ECF No. 38-1 at PageID 166; ECF No. 42-1 at PageID 443.) Although Shelby County asserts that Edwards was terminated "for cause," Edwards disputes this claim. (ECF No. 38-1 at PageID 166; ECF No. 42-1 at PageID 443-45.) The DAF states that Edwards's termination was pursuant to Personnel Policy 703 for "Acts of Insubordination, Habitual tardiness and/or absenteeism, Falsification of any Information that is required by the County" as well as under the Attendance Policy. (ECF No. 43-27 at PageID 764.) Shelby County provided Edwards neither a pre-termination hearing nor an opportunity for a post-termination appeal. (ECF No. 22 at PageID 96; ECF No. 24 at PageID 122.)

## C.  Suttle's Reports

In her Response to the Motion for Summary Judgment, Response to Defendant's Statement of Undisputed Material Facts, and Plaintiff's Supplemental Statement of Material Facts, Edwards challenges each of the assertions made against her in Suttle's two reports and the final DAF. Suttle's initial report claimed that there were occasions in August 2021 when Edwards did not show up at the Waffle House and that Suttle "assisted

---

[3]Shelby County initially contended that Edwards was terminated effective October 11, 2021. (ECF No. 24 at PageID 112.)

Ms. Thomas with loading the breakfast in [Suttle's] vehicle and transported it over to the Econo Lodge." (ECF No. 43-8 at PageID 716.) Edwards responds that:

> During this lawsuit, Defendant stipulated that "All receipts submitted by Susie Suttle for meal purchases made at the Waffle House for clients housed at the Econo Lodge – Lakeland, whether using petty cash or other means, have been produced by the County, and in August 2021, specifically only for the following four dates: August 26, 27, 28, and 30, 2021." [(ECF No. 43-2 at PageID 500.)] However, Edwards was off work on August 26 and 27, and delivered meals with coworker Velma Thomas on August 28 and 29 without any assistance from Suttle. [(ECF No. 43-4 at PageID 588; ECF No. 43-5 at PageID 623-24.)] Also, Edwards' mileage report, signed by Suttle on September 4 confirms Edwards drove 92 miles and her destination was Lakeland. [(ECF No. 43-14 at PageID 734.)] The meal delivery schedule for August 2021 also shows Edwards was not scheduled to deliver meals on August 30 and 31. [(ECF No. 43-15 at PageID 735.)] Suttle is unable to state any specific dates for her visits to Waffle House necessitated by Edwards allegedly failing to show up for work. [(ECF No. 43-6 at PageID 688-89 .)]

(ECF No. 42-1 at PageID 446-47.) In response to Suttle's statement that on September 20, 2021, Edwards left work for a doctor's appointment at 9:00 a.m. and did not return until 4:00 p.m. (ECF No. 43-8 at PageID 716), Edwards avers that

> she left the office about 10 am on September 20 to attend a doctor's appointment. [(ECF No. 43-5 at PageID 626.)] At 9:07 am, an e-mail from Jasmine Hamlin to Suttle and others stating, "I have letters at the office for pickup." [ECF No. 43-5 at PageID 625.)] At 10 am, Suttle replied "Jasmine, I gave the letters to Rebecca." (Id.) The letters needed to be delivered to patients at the Econo Lodge. [(Id.)] Edwards also delivered more letters to the Econo Lodge after she returned from her doctor's appointment.

> [(<u>Id.</u> at PageID 626.)] Importantly, regarding this
> allegation, Suttle agrees Edwards asked for permission
> to attend her doctor's appointment, Suttle approved
> the request, and Suttle did not ask Edwards' for a
> doctor's note. When Edwards returned to the office,
> Suttle cannot recall why she did not confer with
> Edwards about her doctor's appointment or how she
> verified the alleged amount of time Edwards spent
> outside the office that day. [(ECF No. 43-6 at PageID
> 689-90.)]

(ECF No. 42-1 at PageID 448.) The parties also disagree about

when Edwards returned from her appointment. <u>Compare</u> ECF No. 22

at PageID 89 ("On September 20, 2021, at about 2:30 PM, Ms.

Edwards returned to COVID Response Unit[.]"), <u>and</u> ECF No. 43-4

at PageID 585 ("I got back to the office at 2:30."), <u>with</u> ECF

No. 24 at PageID 116 ("Plaintiff returned to her assigned post

at approximately 4:00 p.m. on September 20, 2021."). Edwards

alleges that she saw and spoke to Suttle when she returned at

2:30 p.m., waited for the letters Suttle assigned her to

deliver, and spoke to Suttle as she left to deliver them at 4:30

p.m. (ECF No. 43-4 at PageID 585.) Edwards did not submit any

documentation that she was taking, or had taken, sick leave.

(<u>Id.</u>)

Regarding what Suttle detailed as Edwards's absenteeism on

September 21, 2021, (ECF No. 43-8 at PageID 716.), Edwards

counters that:

> Here, by contrast, at 7:07 pm on September 20, Suttle
> e-mailed Edwards to instruct her to be at the Econo
> Lodge at 8 am the next day. Edwards only saw Suttle's
> e-mail because she checked her cell. [(ECF No. 43-5 at

> PageID 626–27; ECF No. 43-17 at PageID 737.)] Suttle
> told Edwards to use her own vehicle to inventory and
> transport the belongings of patients leaving the Econo
> Lodge and moving to a homeless shelter, with one trip
> at 8 AM and a second trip at 10 AM. [(ECF No. 43-5 at
> PageID 627.)] Edwards stated Suttle told her to report
> to the CRU after transporting the belongings of the
> patients from the Econo Lodge and then would have left
> work at about 4:40 PM. [(ECF No. 43-5 at PageID 627.)]

(ECF No. 42-1 at PageID 448–49.) In response to Suttle's

report's entry for October 4, 2021, (ECF No. 43-8 at PageID 716–

17), Edwards alleges:

> By contrast, Edwards states there was no data entry
> assignment on October 4 because there was County work
> to be done, including Homeland Security and FEMA.
> Edwards denies leaving work at 4 pm. [(ECF No. 43-4 at
> PageID 587.)] Suttle is unable to recall if Edwards
> worked at the Econo Lodge that day. [(ECF No. 43-6 at
> PageID 691.)] Edwards states Suttle told her to work
> at the CRU on October 4 because there was only one
> patient at the Econo Lodge. [(ECF No. 43-4 at PageID
> 582, 588-89.)] Edwards denies Suttle spoke to her
> about her alleged behavior on October 4, or on any
> other date. [(ECF No. 43-4 at PageID 589.)] Instead,
> on October 4, Edwards told Suttle about her nyctalopia
> — a night-blindness impairment — and Edwards offered
> to obtain a letter from her doctor to confirm this
> impairment made it unsafe for her to drive at night,
> specifically after 11:30 pm. [(ECF No. 43-5 at PageID
> 629-31.)] Suttle responded by arguing, "You've driven
> at night before. You can drive at night." (Id.) Suttle
> concluded this conversation by stating she would talk
> to Kmet, but Edwards needed to work the shift in the
> meantime. [(Id. at PageID 629-30.)] Further, Suttle
> admits Edwards did not return from vacation until
> October 4. [(ECF No. 43-6 at PageID 691.)] Edwards
> confirms she was on vacation on October 3 — the "shift
> on yesterday" and therefore, plainly, would not have
> assisted with meals on that day. [(ECF No. 43-5 at
> PageID 630.)]

(ECF No. 42-1 at PageID 449-50.) In response to Suttle's report's entry for October 5, 2021, (ECF No. 43-8 at PageID 717), Edwards states:

> Edwards denies Suttle called her on October 5 about assisting with meal deliveries on October 4 because Suttle had told her on October 4 that her assistance was not needed on account of just one patient being at the Econo Lodge. [(ECF No. 43-5 at PageID 630.)] However, Suttle did call her three or four times on the morning of October 5 to ask whether she was refusing to work the new shift, and Edwards confirmed she would work "but [] under protest" before assisting with the meals for the rest of the day. [(<u>Id.</u>)] Edwards states she only discussed a doctor's letter on October 4 with Suttle, and not on October 5. [(<u>Id.</u>)]

(ECF No. 42-1 at PageID 450-51.)

In response to Suttle's October 6, 2021 addition regarding the August complaint about Edwards allowing COVID-19-positive patients to remove their masks, (ECF No. 43-7 at PageID 713), Edwards states:

> Here, Suttle cannot recall when she allegedly received this complaint, cannot recall the name of the person allegedly complaining, cannot recall if she made any notes about the complaint, and cannot recall if she informed her superiors[. (ECF No. 43-6 at PageID 690-91.)] Suttle only recalls telling Edwards about the complaint and Edwards denied it. [(<u>Id.</u>)] Edwards disputes the allegation and specifically recalls she gave a patient bottled water and told her she could not drink it until she got to the hotel. [(ECF No. 43-4 at PageID 584-85.)]

(ECF No. 42-1 at PageID 449.) Regarding Suttle's October 6, 2021 addition about Edwards's alleged start time and phone call on October 5, 2021, (ECF No. 43-7 at PageID 714), "Edwards asserts

- 18 -

the comment simply confirms she was performing her job and cannot explain why the allegation is even included by Suttle in her report." (ECF No. 42-1 at PageID 451 (citing ECF No. 43-4 at PageID 589-90)). Regarding Suttle's October 6, 2021 addition about alleged tardiness on October 6, (ECF No. 43-7 at PageID 714), Edwards states:

> Here, Edwards arrived at the Econo Lodge while Suttle was on the telephone with her coworker. [(ECF No. 43-4 at PageID 590.)] Edwards states she is not required to check-in with Mr. Patel, the owner of Econo Lodge, when arriving at Econo Lodge. [(Id.)] Meanwhile, by her own admission, Suttle did not call Edwards about her new shift until after it began, following a day when Edward [sic] was scheduled by Suttle to work until 11:30 pm. In fact, on October 5, Suttle had told her superior, Jennifer Kmet, that Edwards did not want to work at night because she could not drive at night, and Kmet responded to Suttle that same day to confirm Edwards' shift could end at 7 pm instead of 11:30 pm. [(ECF No. 43-19 at PageID 744.)] However, Suttle waited to call Edwards until "after 10.30 [AM]" on October 6 to tell Edwards that Kmet changed her schedule, and "I know this is late. Get there when you can." [(ECF No. 43-4 at PageID 587.)] Edwards already had a COVID test scheduled for 1 pm and headed to the Econo Lodge after it was completed. [(Id.)]
>
> Additionally, on October 5 at 4:07 PM, Edwards emailed Suttle and Kmet to confirm she would work at the Econo Lodge that day, and again on October 6, but "under protest" and complained about the dangerous environment at the Econo Lodge, with a specific example of criminal activities she witnessed on September 13. [(ECF No. 43-20 at PageID 756-57.)]

(ECF No. 42-1 at PageID 451-52.)

With the DAF, Edwards largely renews her responses to Suttle's reports, but raises several additional objections.

First, Edwards points out that the August 2021 claims made in Suttle's reports were no longer present in the DAF. (Id. at PageID 454.) Further, regarding the conversation between Suttle and Edwards on October 4, 2021, Edwards states:

> Here, Suttle' [sic] allegation has evolved. The DAF omits all reference to Edwards' medical impairment or medical basis for requesting her shift be modified to not end at 11:30 pm, and Edwards' agreement to still work the shift under protest. As stated, Edwards was not shown any of the statements that allegedly contradicted her claims of criminal activities at the Econo Lodge. [ECF No. 43-6 at PageID 692.] . . . Further, the record shows that Defendant's patients were not the only people staying at the Econo Lodge between August and October 2021. [(ECF No. 43-19 at PageID 747.)] Defendant did not conduct a prior criminal background check on clients, nor did they check for history of warrants. [(Id. at PageID 746.)] Kmet's department did not keep track of reports of crime at the Econo Lodge between August and October 2021. [(Id. at PageID 747.)] Defendant did not have any way of tracking if the police were called to the Econo Lodge. [(Id.)]

(ECF No. 42-1 at PageID 455-56.) Finally, although the DAF claims there was security present at the Econo Lodge on October 6, 2021, Shelby County stated that "Universal Security provided security services at the Econo Lodge Lakeland on an as-needed basis. They did not provide services for the month of October 2021[.]" (ECF No. 43-28 at PageID 772 ("Shelby County's Responses to Plaintiff's Second Set of Interrogatories and Requests for Production").)

Edwards further contends that Shelby County can provide no proof of her absences generally, because

> according to Defendant's pay records for Edwards, she
> worked 81.25 hours for every bi-weekly pay period
> without any missing work time. Indeed, the pay
> statement for October shows a stipend bonus payment of
> $5,000. [(ECF No. 43-11 at PageID 725 (Shelby County
> Attendance Policy).)] Suttle admits Edwards would turn
> in a time sheet between August and October 2021, but
> she is unable to recall any other details of how
> working hours were recorded because the events
> discussed were two years ago. [(ECF No. 43-6 at PageID
> 673.)] Edwards states 81.25 hours represented standard
> working hours and was recorded by Suttle without any
> input from her, and no issues with her working time
> were raised with her by Suttle in August 2021. [(ECF
> No. 43-5 at PageID 623; ECF No. 43-13 at PageID 731.)]

(ECF No. 42-1 at PageID 445.) Edwards does admit, however, that
as an exempt employee, her pay stubs always said 81.25 hours,
regardless of how many hours she actually worked. (ECF No. 43-5
at PageID 641.)

## C.   Procedural History

Following her termination, Edwards filed a Charge of
Discrimination with the Tennessee Human Rights Commission, which
was subsequently transferred to the Equal Employment Opportunity
Commission ("EEOC"). (ECF No. 22 at PageID 81.) Edwards filed
her initial complaint before obtaining her Notice of Right to
Sue from the EEOC. (Id.) On January 18, 2023, the EEOC issued
the plaintiff her Notice of Right to Sue, (ECF No. 51 at PageID
894), and she subsequently filed an Amended Complaint on January
24, 2023 (ECF No. 22). In this complaint, Edwards alleges that
Shelby County violated 42 U.S.C. § 1983 by denying her
procedural due process guaranteed by the Fourteenth Amendment to

the United States Constitution and the Shelby County Civil
Service Merit Act of 1971, also known as 1971 Tenn. Priv. Acts,
ch. 110, and violated the Americans with Disabilities Act (as
amended by the ADA Amendments Act of 2008) ("ADA"), 42 U.S.C. §
12101 et seq. (ECF No. 22 at PageID 79-80.) Regarding her
procedural due process claim, Edwards states that she was denied
a pre-termination hearing and a post-termination appeal in
violation of her due process rights. (Id. at PageID 99.)
Regarding the disability claim, Edwards states that Shelby
County engaged in discrimination by failing to accommodate her
requests for time off, provide her an altered work schedule so
that she would not have to drive at night, and address her
complaints of unsafe working conditions. (Id. at PageID 100.)
She further claims that she was subject to disparate treatment
on the basis of her disability and that her ultimate termination
was in retaliation for her requests for accommodations. (Id. at
PageID 100.)

On March 5, 2024, Shelby County filed the present motion
for summary judgment. (ECF No. 38.) Regarding Edwards's
procedural due process claim, it argues that Edwards never had a
property interest in her job because Edwards knowingly accepted
an unclassified position upon her promotion. (ECF No. 44 at
PageID 829-30.) As for her ADA claims, Shelby County asserts
that Edwards's claimed conditions do not qualify as disabilities

under the ADA and that, regardless, her firing was made for legitimate, nondiscriminatory reasons and she cannot show pretext. (ECF No. 38-2 at PageID 177–86.)

## II. ANALYSIS

**A.   Legal Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." Goins v. Clorox Co., 926 F.2d 559, 561 (6th Cir. 1991). Rule 56(c) provides that a party must support an assertion of fact by citing to materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers or other materials[,]" or a party must show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When analyzing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Huckaby v. Priest, 636 F.3d 211, 216 (6th Cir. 2011) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In doing so, the court may not make credibility determinations or weigh the evidence. Jordan v. Kohl's Dep't Stores, Inc., 490 F. App'x 738, 741 (6th Cir. 2012) (citing Anderson, 477 U.S. at 255). Rather, it must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Block v. Meharry Med. Coll., 723 F. App'x 273, 277 (6th Cir. 2018) (quoting Anderson, 477 U.S. at 251-52)).

**B.   Edwards's Procedural Due Process Claim**

1.   Procedural Due Process – Property Interest

The Due Process Clause of the Fourteenth Amendment forbids a state from depriving persons of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1, cl. 3. For Edwards's procedural due process claim, she must show: (1)

that she was deprived of a protected liberty or property interest; and (2) that the deprivation occurred without adequate procedural protections. <u>Ingraham v. Wright</u>, 430 U.S. 651, 672 (1977); <u>Crosby v. Univ. of Ky.</u>, 863 F.3d 545, 552 (6th Cir. 2017). Only the first prong is at issue here.

"Property interests are not created by the Constitution[;] 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 538 (1985) (quoting <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972)). "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." <u>Singfield v. Akron Metro. Hous. Auth.</u>, 389 F.3d 555, 565 (6th Cir. 2004) (citing <u>Perry v. Sindermann</u>, 408 U.S. 593, 602 (1972)). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." <u>Town of Castle Rock v. Gonzales</u>, 545 U.S. 748, 757 (2005) (citation omitted). "A job or government benefit is a property interest if there are 'rules or mutually explicit understandings that support [a plaintiff's] claim of entitlement to' it." <u>Kaplan v. Univ. of Louisville</u>, 10 F.4th 569, 577–78 (6th Cir. 2021) (quoting <u>Perry</u>, 408 U.S. at 601)). "The hallmark

of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982).

> Where a state civil service system categorizes public employees as classified — that is, not subject to removal at will — employees have a state-law-created, constitutionally protectable property interest in maintaining their current employment. Conversely, unclassified employees have no property right in maintaining their jobs; and the State may terminate them summarily.

Kizer v. Shelby Cnty. Gov't, 649 F.3d 462, 466 (6th Cir. 2011) (citing Loudermill, 470 U.S. 538-40) (citations omitted).

    2.   Shelby County's 2020-21 Compensation Policy

As the district court in Kizer explained:

> In 1971, the Tennessee General Assembly enacted Chapter 110 of the Tennessee Private Acts, establishing the Tennessee Civil Service Merit System for employees of Shelby County, Tennessee. The Act established Defendant Shelby County Civil Service Merit Board as the body charged with determining how each available county job should be classified under the Merit System. If the Board determines that a position is "classified," the Act requires that civil service protections apply to that position. Shelby County must fill classified positions through open, competitive evaluations after advertising the job openings for thirty days. Classified employees are not terminable at will.

Kizer v. Shelby Cnty. Gov't, No. 08-2570, 2010 WL 297861, at *1 (W.D. Tenn. Jan. 20, 2010), aff'd sub nom. Kizer, 649 F.3d 462 (citations and abbreviations omitted). The Shelby County Charter ("the Charter") sets out the general framework for the county's

government. Shelby Cnty. Charter, arts. I–V (2018). Discussing
civil service, the Charter states:

> No classified person defined in the civil service law
> shall be removed from[,] or discriminated against with
> respect to, any county position or appointive county
> administrative office because of race, creed, color,
> sex, national origin or political opinions or
> affiliations. The maintenance and administration of an
> effective civil service system shall be in accordance
> with Chapter 110 of the Private Acts of 1971, as
> amended, until the effective date of this charter, and
> all existing rules and regulations promulgated there
> under. After the effective date of this charter, the
> terms and provisions of that Act may be amended by
> ordinance, not contrary to law, provided that nothing
> in this section or in the charter shall impair or
> diminish the rights and privileges of the existing
> employees under civil service.

Id. § 6.09 (alteration in original). The Shelby County Code of
Ordinances states that "[f]or unsatisfactory performance of
duties or other just cause, an employee in the classified
service may be subject to the following discipline. . . .
[d]ismissal from service." Shelby Cnty. Code of Ordinances, §
14-41. Differentiating unclassified and classified employees,
the Code of Ordinances states:

> (a) The job positions of the county are hereby divided
> into the unclassified and classified services.
>
> (b) Those employed in positions deemed to be included
> in the unclassified service are not included and not
> covered under the provisions of the civil service
> merit system. The unclassified service shall include:
>
>> (1) Officials elected by popular vote and persons
>> appointed to fill vacancies in such elective
>> offices;

(2) Members of duly established boards and commissions of the county;

(3) Any person retained by the county on a consulting basis and/or any professional person hired in his professional capacity as determined by the board;

(4) Any employee of the county whose employment is on a temporary basis;

(5) Any person who provides services to the county on a volunteer basis or who receives no compensation for such services;

(6) Such person occupying the position of department head, deputy department head, chief clerk, manager responsible for policy-making, personal assistant to a department head or personal secretary to a department head as is designated by an appointing authority and approved by the board. The intent of this provision is to restrict positions in the unclassified service to those which involve sensitive policymaking duties. In granting its approval the board shall consider this intent as well as the size of the department in question. A list of these additional positions shall be prepared and maintained by the secretary;

(7) All county employees of the Shelby County Head Start Program.

(c) The classified service shall comprise all offices and positions of employment for the county not specifically included in the unclassified service.

(d) Unclassified positions are excluded from the civil service merit system and are considered non-civil service. The classified/unclassified status of a job position is determined when the job position is initially established and/or each time the duties, responsibilities and scope of the position are reviewed by human resources. The classified/unclassified status may be changed as initiated by the appointing authority upon determination by the administrator of the human

- 28 -

resources department that the job position duties,
scope and relationship to the appointing authority
have changed significantly to warrant such change in
status. The board must approve a position change from
classified status to unclassified status.

Id. § 14-28. The Charter defines an ordinance as follows:

The word "ordinance" when used in connection with any
action taken by the board of county commissioners
shall mean any local legislation adopted by that body
which is adopted according to the formalities as set
forth in this charter and is of countywide concern in
a permanent nature in its effect, whether in a
governmental or proprietary nature, including, but not
limited to, all types of former actions ratified by
the board of county commissioners in the nature of
private acts.

Shelby Cnty. Charter, § 5.03(A). Discussing chartered counties,

Tenn. Code Ann. § 5-1-211(d)(5) states that "[n]o ordinance

shall be amended except by a new ordinance."

On May 7, 2020, the Shelby County Board of County

Commissioners passed a resolution approving a 2020-21

Compensation Policy ("Compensation Policy") for county

employees. (ECF No. 44-1 at PageID 835 (Shelby County

Resolution).) Unlike an ordinance, the Charter defines a

resolution as follows:

The word "resolution" shall mean any measure adopted
by the board of county commissioners which is not an
ordinance, requiring a majority vote for passage
unless otherwise required by law for the issuance of
bonds, notes or other evidence of indebtedness of the
county and dealing in matters of a temporary or
special nature, generally involving administrative
matters.

Shelby Cnty. Charter, § 5.03(B). Comparing the three main categories of employment status, the Compensation Policy stated:

> 1. Regular Permanent
> An employee designated as a regular employee may be a full-time or part-time employee. This employee will have successfully completed the new employment probation period.
>
> 2. Durational
> A Durational Employee is an employee who is employed for a specific period (i.e., grant, contract or project) of twelve months or longer. Durational employees receive all benefits and are considered to be in the unclassified service and the equivalent of permanent employees except for the term nature of their employment.
>
> 3. Temporary
> A temporary employee is an employee who averages no more than 25 hours per week for nine (9) months in a 12 month period -- appointed in the unclassified service.

(Id. at PageID 842.) Prior to this policy, durational employees were considered classified. When the new Compensation Policy was adopted, it expressly sought to reclassify durational employees:

> Durational Employees which include (Grant, Contract, and Project) employees should be *changed to "Unclassified"*. Because of the required goals, timelines, and impact expected from these roles, attendance and performance are critical to the achievement of work assigned to these types of positions. Poor attendance and/or performance has an immediate and direct impact on the departments [sic] ability to achieve their goals, therefore the department need [sic] to have the flexibility to terminate poor performance quickly and efficiently.

(Id. at PageID 870) (emphasis in original).

Edwards argues that because the Compensation Policy was a resolution and not an ordinance, the county did not utilize the proper legal channels to make durational employees unclassified. (ECF No. 42 at PageID 410, 412.) To further support her claim that improper procedures were followed, she cites to the powers of the county's Civil Service Merit Board ("Merit Board"), which is tasked with "hear[ing] the appeal of any employee in the classified civil service following his/her removal, suspension or reduction in rank or compensation by the appointing authority, as provided in section 14-42[.]" (Id. (quoting Shelby Cnty. Code of Ordinances, § 14-64).) She suggests that because "the Civil Service Merit Board failed to even apply the Ordinance to the duties of Edwards' position," Edwards was improperly classified, leaving her "in limbo, as the Civil Service Merit Board never acted to determine her to be unclassified, with her department of the County erroneously believing she was unclassified *per se,* by a Compensation Policy." (Id. at PageID 411 n.7.)

3.   Due Process and Edwards's Property Right to the Job

Edwards spills much ink arguing that the county's alleged failure to follow procedure means that she, as a durational employee, should have been classified and therefore was entitled to a pre-termination hearing and a post-termination appeal. But this argument misses the forest for the trees. Edwards never had

a property right in her job, and therefore, regardless of the county's alleged failure to follow its protocol, she cannot demonstrate that her procedural due process rights were violated.

In Kizer, the Sixth Circuit addressed a situation in which the Merit Board had categorized several positions as unclassified, and the now-fired employees sought to prove that they nonetheless possessed a property right because they should have been categorized as classified. 649 F.3d at 463-65. In rejecting this argument, the Sixth Circuit made several points. First, the court recognized that appellants "accepted their appointments knowing" that they would be unclassified employees. Id. at 467. The court also noted that the appellants served in their positions for "years . . . without making a single request to have the status of their positions altered in any way." Id. Second, "and more importantly[,]" the Sixth Circuit explained that this issue had previously been addressed in Christophel v. Kukulinsky, 61 F.3d 479, 486 (6th Cir. 1995). Id. As the Kizer court explained:

> In Christophel, the plaintiff claimed that although she was hired as an unclassified civil servant, she should have had classified status. Christophel alleged that her former employer, a state university, systematically labeled employees as unclassified when they should have been given classified status. Id. The defendants moved for summary judgment, claiming that they were entitled to qualified immunity because they had not violated a clearly established constitutional

right to due process. Id. at 484. The district court,
however, denied that motion after concluding that
genuine issues of material fact remained about whether
the University had a system of misclassifying
employees. Id. According to the district court, if
Christophel were correct in her assertion that she was
misclassified as an unclassified civil servant in
violation of Ohio law, the defendants would have been
acting outside their discretion regarding that
classification and would not be entitled to the
protection of qualified immunity. Id.

On appeal, we rejected Christophel's claim that
because her position should have been classified, she
was entitled to the due process rights of a classified
civil servant at the time her position was abolished.
Id. at 486. "Implicit in Christophel's syllogism,"
this court noted, "is a crucial premise, i.e., that,
under Ohio law, an unclassified civil servant's
contention that she *should be* placed in the classified
service automatically bestows on her the rights which
accompany classified status, and automatically imposes
on the defendants the duties owed to those having
classified status." Id. (emphasis added). Finding no
support in Ohio law for Christophel's argument, this
court emphasized the "fundamental difference" between
"the attainment of a state-recognized status, and the
mere assertion of a right to that status." Id. The
Christophel court concluded that "[u]ntil the state
bestows the right or benefit, there is no property
right, and nothing for the procedural protections
afforded by the Due Process Clause to protect." Id.

Id. at 467-68 (emphasis in original). Comparing the Kizer

plaintiffs' claim to the one in Christophel, the Sixth Circuit

concluded:

The facts of this case require the same result. The
Appellants were hired as unclassified civil servants.
They were not subject to the merit selection
requirements, acceded to their status as unclassified
employees, and enjoyed the benefits associated
therewith. The Appellants now claim, like Christophel
did, that their positions have been miscategorized all
along. Their claim boils down to this: they were

entitled to the due process protections afforded to classified employees because they should have been categorized as classified employees. But this amounts to nothing more than an "asserted" right to classified status. And, just like in Christophel, this "so-called right is no more than an inchoate claim, not yet adjudicated or otherwise acted upon." Id.

In other words, asserting a right to a certain classification does not make it so. If simply claiming to be entitled to classified status could trigger the due process rights attendant to that actual classification, the distinction between classified and unclassified employees would be meaningless. Any unclassified or appointed employee claiming that his position was miscategorized could demand, and the County government would be required to provide, due process to people hired or appointed as at-will employees. Such a result defies logic and finds no support in Tennessee law. Because the Appellants were not hired pursuant to the procedures bestowing classified status upon an employee, they failed to show that they have a constitutionally protected property interest in their employment. And, without a legitimate property interest, the Due Process Clause offers no procedural protections to these former employees.

Id. at 468.

Edwards contends that Kizer is distinguishable from the present case because there is a distinction between a position having been wrongly categorized by the Merit Board and a position having been re-categorized because the "County misinterpreted the legislative framework, and the Civil Service Merit Board failed to even apply the Ordinance to the duties of Edwards' position, as required by law." (ECF No. 42 at PageID 411 n.7.) However, Kizer stands for the proposition that knowingly accepting an unclassified position, even if it may

have been miscategorized, prevents a person from later claiming
the benefits of a classified one. Edwards signed her December 1,
2020 hire letter that clearly stated her new position was "not a
Civil Service Merit System classified position." (ECF No. 38-4
at PageID 190.) She was thus unequivocally "not hired pursuant
to the procedures bestowing classified status upon an employee,"
and therefore cannot now claim a property interest in the
position. Kizer, 649 F.3d at 468; see also Wood v. Davis, No.
M2013-01008-COA-R3-CV, 2014 WL 2568568, at *2 (Tenn. Ct. App.
June 5, 2014) ("Like the employees in Kizer, Wood accepted the
job knowing the classification as executive service, worked for
several years without trying to do anything about it, and
complained only when he was terminated. He had no property
interest that was protected.").

This is a fundamentally different scenario from one where a
county employee was initially hired as a classified employee.
Had this employee been reclassified due to improper legislative
procedures, and then been fired as an unclassified employee,
Kizer arguably would not apply because the employee was
initially hired pursuant to the procedures bestowing classified
status upon her. Edwards's case does not present such a
question, and therefore the court need not make any further
determination as to the validity of the Compensation Policy in
relation to the Shelby County Code of Ordinances.

Edwards next argues that, even as an unclassified employee, the Shelby County Employee Discipline Policy and Procedure internal regulations ("Discipline Policy"), as well as the Shelby County Employee Handbook ("Employee Handbook") and the Code of Ordinances Section 14-42(b), nonetheless grant her a property right. (ECF No. 42 at PageID 412-13.) She first cites the Discipline Policy, which was still in effect both at the time of Edwards's hiring, as well as her termination, which states: "Any permanent or durational employee demoted in rank or compensation, suspended without pay for a period exceeding ten (10) days, or terminated, may within seven (7) calendar days after service of the order of demotion, suspension or termination, appeal to the Board." (ECF No. 38-10 at PageID 391 (Discipline Policy).) She also points to the Employee Handbook, which describes several appeals procedures for disciplinary action:

1. **Administrative Grievance Procedure** - For appeals of any disciplinary action that <u>cannot</u> be appealed to the Civil Service Merit Board

2. **Civil Service Merit Board** - For discipline involving a demotion in rank or compensation, suspension without pay for more than 10 days and termination.

    To be eligible for a Civil Service Merit Board appeal, an employee must file a written request with the Administrator of Human Resources within seven calendar days of receipt of the written notice of the disciplinary action.

> Within 30 days of the filing of an appeal, the Board
> will schedule a hearing on the matter. An employee
> is entitled to appear, have a public hearing,
> produce evidence, and be represented by legal
> counsel. At the end of the hearing, the Board will
> deliberate and publish its decision. The Board may
> affirm, modify, or revoke the discipline.

(ECF No. 43-3 at PageID 540 (Employee Handbook)) (emphasis in
original). Edwards notes that the "Administrative Grievance
Process" was cited in the DAF. (ECF No. 42-1 at PageID 440
(citing ECF No. 38-6 at PageID 355).) Edwards cites the Code of
Ordinances for her final support, stating:

> The Code of Ordinances states at Sec. 14-42(b), states
> that "Any employee demoted in rank or compensation,
> suspended without pay for a period exceeding ten
> calendar days, or dismissed, may, within seven
> calendar days after service of the order of demotion,
> suspension or dismissal as hereinabove provided,
> appeal to the board." Although the County argues this
> only applies to classified employees, and Edwards
> was unclassified, this sentence stating, "any employee" is
> written differently than the proceeding sentence in
> Sec. 14-42(a), which begins with "any employee in the
> system . . . ."

(ECF No. 42 at PageID 412-13.) Edwards is effectively claiming
that she had a property interest in the *procedures* used by
Shelby County for its employees. However, where there is no
property interest in the job, there is no protected property
interest in the procedures which attend the decision to
terminate the job. See <u>Elion v. Shelby Cnty. Gov't</u>, No. 08-2411-
P, 2012 WL 7110531, at *9-10 (W.D. Tenn. Dec. 10, 2012)

(collecting cases); see also Stiger v. Johnson, 608 F. App'x 321, 324 (6th Cir. 2015) (citing Elion with approval).

Finally, in its undisputed statement of facts, Shelby County states that "Edwards was terminated for cause effective October 8, 2021." (ECF No. 38-1 at PageID 166.) Edwards, in her response, vehemently denies that the firing was "for cause," and discusses the ways in which the county allegedly failed to follow its "just cause" termination policies for Edwards. (ECF No. 42-1 at PageID 443-46.) This distinction is nonetheless irrelevant for purposes of Edwards's procedural due process claim because Shelby County had the authority to terminate Edwards with or without cause, and there is no protected property interest in the procedures which attend the decision. Elion, 2012 WL 7110531, at *9-10. Edwards has not shown that she has a "constitutionally protectable property interest in maintaining [her] employment," and thus "the Due Process Clause offers no procedural protections" to her. Kizer, 649 F.3d at 468. Therefore, Shelby County's Motion for Summary Judgment is GRANTED as to Edwards's procedural due process claims, and those claims are DISMISSED WITH PREJUDICE.

## C.  Edwards's Discrimination Claims

Under the ADA, employers may not "discriminate against a qualified individual on the basis of disability" regarding the "terms, conditions, and privileges of employment." 42 U.S.C. §

12112(a).  Disability  discrimination  claims  may  be  based  on
either direct or indirect evidence. Lovell v. Champion Car Wash,
LLC, 969 F. Supp. 2d 945, 950 (M.D. Tenn. 2013). "[A] plaintiff
need only prove one or the other, not both." Hedrick v. Western
Rsrv. Care Sys., 355 F.3d 444, 453 (6th Cir. 2004). "Direct
evidence of disability discrimination 'does not require the fact
finder to draw any inferences [to conclude] that the disability
was at least a motivating factor.'" Fisher v. Nissan N. Am.,
Inc., 951 F.3d 409, 416 (6th Cir. 2020) (quoting Hostettler v.
Coll. of Wooster, 895 F.3d 844, 853 (6th Cir. 2018)). In this
case, Edwards does not appear to assert that she has direct
evidence of discrimination.

    When  a  disability  discrimination  claim  for  wrongful
termination  is  based  on  indirect  evidence,  it  is  instead
analyzed  under  the  burden-shifting  framework  set  forth  in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Babb v.
Maryville Anesthesiologists P.C., 942 F.3d 308, 319 (6th Cir.
2019). Under this framework, Edwards has an initial burden of
presenting sufficient evidence for a reasonable jury to conclude
that  she  has  made  a  *prima  facie*  case  for  disability
discrimination. Equal Emp. Opportunity Comm'n v. Ford Motor Co.,
782 F.3d 753, 767 (6th Cir. 2015). To establish a *prima facie*
case  for  wrongful  termination  under  the  ADA,  Edwards  must
demonstrate the following:

> 1) that [s]he is disabled; 2) that [s]he is otherwise
> qualified for [her] previous position with [Shelby
> County], with or without reasonable accommodation; 3)
> that [s]he suffered an adverse employment decision; 4)
> that [Shelby County] knew or had reason to know of
> [her] disability; and 5) that [s]he was replaced or
> that [her] position remained open while [Shelby
> County] looked for other applicants.

Plant v. Morton Int'l, Inc., 212 F.3d 929 (6th Cir. 2000). If
Edwards makes such a showing, the burden shifts to Shelby County
to offer a legitimate, non-discriminatory reason for her
termination. Jackson v. VHS Detroit Receiving Hosp., Inc., 814
F.3d 769, 776 (6th Cir. 2016). Finally, if Shelby County makes
this showing, the burden shifts back to Edwards to show that the
proffered reason was pretextual. Id. Unlike with direct
evidence, where discrimination need only have been a motivating
factor, in cases with indirect evidence, "[i]t is the
plaintiff's ultimate burden to show that she was terminated 'on
the basis of disability,' 42 U.S.C. § 12112(a), meaning she must
show that her disability was a 'but-for' cause of her
termination." Lockhart v. Marietta City Sch., No. 20-4308, 2021
WL 4810172, at *7 (6th Cir. Oct. 15, 2021) (quoting Lewis v.
Humboldt Acquisition Corp., Inc., 681 F.3d 312, 321 (6th Cir.
2012) (en banc)). It does not appear contested that Edwards was
qualified for her position at Shelby County, nor that she
suffered an adverse employment decision. The court also notes

that Shelby County does not appear to challenge Edwards's *prima
facie* case regarding the "similarly-situated" prong.

Failure-to-accommodate claims, however, do not involve the
McDonnell Douglas burden-shifting approach for claims based on
indirect evidence. Instead, "ADA failure to accommodate claims
are analyzed pursuant to the direct test." Fisher, 951 F.3d at
417. As the Sixth Circuit explained in Kleiber v. Honda of Am.
Mfg., Inc., 485 F.3d 862 (6th Cir. 2007):

> [F]ailing to make a reasonable accommodation falls
> within the ADA's definition of "discrimination."
> Accordingly, claims premised upon an employer's
> failure to offer a reasonable accommodation
> necessarily involve direct evidence (the failure to
> accommodate) of discrimination. Bultemeyer v. Fort
> Wayne Cmty. Sch., 100 F.3d 1281, 1283 (7th Cir. 1996).
> This conclusion is consistent with the definition of
> direct evidence, for if the fact-finder accepts the
> employee's version of the facts, no inference is
> necessary to conclude that the employee has proven
> this form of discrimination. See Jacklyn v. Schering-
> Plough Healthcare Prods. Sales Corp., 176 F.3d 921,
> 926 (6th Cir. 1999) (sex-discrimination case; defining
> direct evidence as "that evidence which, if believed,
> requires the conclusion that unlawful discrimination
> was at least a motivating factor in the employer's
> actions"); Johnson v. Kroger Co., 319 F.3d 858, 865
> (6th Cir. 2003) (race-discrimination case; noting that
> direct evidence does not require the fact-finder to
> draw any inferences to conclude that the defendant
> discriminated against the plaintiff). It is further
> consistent with our analysis in Monette v. Electronic
> Data Systems Corp., 90 F.3d 1173, 1182–84 (6th Cir.
> 1996), in which we noted that claims for failure-to-
> accommodate fall within the category of cases in which
> the employer relies on the employee's disability in
> its decision-making, and consequently are suitable for
> analysis under the direct-evidence framework. See also
> Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d

719, 724-30 (6th Cir. 2000) (applying direct-evidence standard to claim for failure to accommodate).

Id. at 868-69 (quoting Hedrick, 355 F.3d at 452). The *prima facie* standard for a failure-to-accommodate claim is as follows:

> [T]hat (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) [Shelby County] knew or had reason to know about her disability; (4) she requested an accommodation; and (5) [Shelby County] failed to provide the necessary accommodation.

Brumley v. United Parcel Serv., Inc., 909 F.3d 834, 839 (6th Cir. 2018) (citing Deister v. Auto Club Ins. Ass'n, 647 F. App'x 652, 657 (6th Cir. 2016)). For a failure to accommodate claim,

> [o]nce the employee "establishes a prima facie showing that he proposed a reasonable accommodation," [Rorrer v. City of Stow, 743 F.3d 1025, 1041 (6th Cir. 2014)], "the employer has the burden of showing how the accommodation would cause an undue hardship," Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 202-03 (6th Cir. 2010). If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." Kleiber, 485 F.3d at 871 (quoting Bultemeyer v. Fort Wayne Cmty. Schs., 100 F.3d 1281, 1285 (7th Cir. 1996)).

Fisher, 951 F.3d at 421. Edwards must put forth sufficient evidence for a reasonable jury to find in her favor on each of these elements. Haley v. Cmty. Mercy Health Partners, No. 3:11-cv-232, 2013 WL 322493, at *6 (S.D. Ohio Jan. 28, 2013) (citing Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 661 (6th Cir. 2000)).

1.   <u>Whether Edwards was disabled under the ADA</u>

The ADA defines a disabled person as one who (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) does not have an impairment, but is regarded as having one. 42 U.S.C. § 12102(1). "Major life activities are those 'that are of central importance to daily life,' such as 'caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" <u>Brady v. Potter</u>, 273 F. App'x 498, 502 (6th Cir. 2008) (quoting, respectively, <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 197 (2002) and <u>Mahon v. Crowell</u>, 295 F.3d 585, 590 (6th Cir. 2002)). "A substantial limitation of such an activity exists when the individual's ability to perform that activity is limited to a large degree. It is not enough for the impairment to cause merely moderate or intermittent interruptions in the performance of the activity." <u>Id.</u> (citation omitted).

Shelby County first argues that Edwards's conditions — asthma and night blindness — do not qualify her to be considered disabled under the first prong of the disability definition under the ADA. (ECF No. 38-2 at PageID 177.) It insists that there is "no medical testimony, medical opinion, or other evidence in the record proving that" Edwards faced substantial

limitations to one or more of her life activities. (Id. at PageID 180.)

Edwards, under oath, attested to her night blindness and asthma conditions. (ECF No. 43-4 at PageID 592-94.) Although the Sixth Circuit has not addressed whether night blindness qualifies as a disability, the Second, Ninth, and Third Circuits have all held that, at a minimum, when a plaintiff presents evidence that night blindness prevented her from being able to drive at night, "such evidence was sufficient to submit the question to the jury because most people in the general population could see well enough to drive at night." Harris v. MatureCare of Standifer Place, LLC, No. 1:14-CV-64, 2015 WL 4662441, at *3 (E.D. Tenn. Aug. 5, 2015) (citing Capobianco v. City of New York, 422 F.3d 47 (2d Cir. 2005); Livingston v. Fred Meyer Stores, Inc., 388 F. App'x 738, 740 (9th Cir. 2010); and Colwell v. Rite Aid Corp., 602 F.3d 495 (3d Cir. 2010)). The court finds that, based on Edwards's testimony in her deposition regarding her night blindness and its effect on her ability to drive, there is a genuine dispute as to whether her night blindness qualifies as a disability.

Unlike night blindness, asthma has been discussed at great length by courts in the Sixth Circuit. "Asthma has typically been found to rise to the level of a substantial limitation on the major-life-activity of breathing where the plaintiff has a

long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition." Boker v. Sec'y, Dept. of Treasury, No. 1:07-cv-446, 2009 WL 3199074, at *3 (S.D. Ohio Sept. 29, 2009). "Where a plaintiff suffers asthma attacks only in response to particular stimuli and is able to engage in almost all normal life activities, courts have been less likely to conclude that the plaintiff is substantially limited in the major-life-activity of breathing." See id. (collecting cases). Edwards testified that her asthma is severe and, when activated, can cause her difficulty performing household tasks and maintaining conversations. (ECF No. 43-4 at PageID 594.) The court finds that, based on the testimony in her deposition, coupled with her description of her asthma condition when she did not have access to the BREO inhaler, there is a genuine dispute as to whether her asthma qualifies a disability.

Shelby County separately argues that Edwards was not "regarded as" having a disability under the third prong of the ADA disability definition. Because the court has found that both of Edwards's alleged conditions are supported by sufficient evidence that a reasonable jury could find that she is disabled under the ADA's definition, the "regarded as" prong need not be addressed.

2.    Whether Shelby County knew or had reason to know of
      Edwards's disability

Shelby County argues next that it neither knew nor had reason to know that Edwards suffered from asthma and night blindness. It relies primarily on the fact that Edwards did not mention either of these conditions during her pre-promotion medical screening, and the vision tests did not demonstrate any issues with her normal vision. (ECF No. 38-1 at PageID 166; ECF No. 38-2 at PageID 181.)

> Under the burden-shifting analysis, generally, "[a]n employer has notice of the employee's disability when the employee tells the employer that he is disabled." Hammon v. DHL Airways, Inc., 165 F.3d 441, 450 (6th Cir. 1999). In discussing an analogous claim under the Rehabilitation Act, we required that the plaintiff establish "that the defendant knew or believed that the plaintiff was disabled, or knew of the plaintiff's symptoms that were caused by the disability." [Burns v. City of Columbus, 91 F.3d 836, 844 (6th Cir. 1996)]. As we reasoned in Burns, this inquiry is crucial because "unless the [employer] knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by a disability as defined by law, it would be impossible for the [employer] to have made its decision because of the disability." Id. It is also reasonable to conclude, however, that an employer is on notice of a disability if an employee's symptoms are "severe enough to alert" it, giving it either knowledge or "some generalized notion" of the disability. Nilles v. Givaudan Flavors Corp., 521 Fed. Appx. 364, 369 (6th Cir. 2013); see also Hedberg v. Ind. Bell Tel. Co., Inc., 47 F.3d 928, 934 (7th Cir. 1995) ("it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability.").

Yarberry v. Gregg Appliances, Inc., 625 F. App'x 729, 737 (6th Cir. 2015) (all alterations in original except full case citation). Although Edwards did not disclose either condition during the screening, she testified in her deposition that she spoke to Suttle about both her asthma and her night blindness when she was seeking accommodations. (ECF No. 43-5 at PageID 624, 629-30, 684-85.) The court finds that Edwards has produced sufficient evidence from which a reasonable jury could conclude that she communicated both of her alleged disabilities to Suttle, putting Shelby County on notice of her two conditions.

Edwards has thus created a genuine dispute as to each prong of her *prima facie* case, shifting the burden to Shelby County to articulate a nondiscriminatory reason for its action. Ford Motor, 782 F.3d at 767 (citing St. Mary's Honor Ctr., 509 U.S. at 507).

3. Whether Edwards sought, and Shelby County made, reasonable accommodations available for Edwards's alleged disabilities

Before addressing Shelby County's proffered reasons, the court will address Edwards's reasonable accommodation claim. The ADA defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices .

- 47 -

> . . [or] other similar accommodations for individuals
> with disabilities.

42 U.S.C. § 12111(9). An ADA plaintiff "bears the initial burden
of proposing an accommodation and showing that that
accommodation is objectively reasonable." Kleiber, 485 F.3d at
870 (quoting Hedrick, 355 F.3d at 457). "An employer, then, has
the burden of persuasion to show that an accommodation would
impose an undue hardship." Hedrick, 355 F.3d at 457.
Importantly, an employee cannot force her employer to provide a
specific accommodation if the employer offers another reasonable
accommodation. Id.

Medical documentation is not required to request an
accommodation under the ADA. King v. Trumbull Mem'l Hosp., 30
F.4th 551, 564 (6th Cir. 2022). The ADA does not require the use
of any "magic words like accommodation, disability, or ADA" when
an employee requests an accommodation. Childers v. Hardeman
Cnty. Bd. of Educ., No. 13-1209, 2015 WL 225058, at *8 (W.D.
Tenn. Jan. 15, 2015) (citing Leeds v. Potter, 249 F. App'x 442,
449-50 (6th Cir. 2007)). The plaintiff must instead "tie the
request for accommodation to her existing medical condition."
Id. Once an employee requests a reasonable accommodation, "the
employer ha[s] a duty to explore the nature of the employee's
limitations, if and how those limitations [affect] her work, and
what types of accommodations [can] be made." Equal Emp.

Opportunity Comm'n v. Dolgencorp, LLC, 899 F.3d 428, 434 (6th Cir. 2018) (citing Kleiber, 485 F.3d at 871 and 29 C.F.R. § 1630.2(o)(3)).

On September 15, 2021, Edwards states that she sought an accommodation for her asthma, asking Suttle to take the day off because she was struggling to breathe without her BREO inhaler. (ECF No. 43-5 at PageID 624.) Edwards testified that in response, Suttle stated that she no longer had "time to get anybody, and Nick can't handle this family of eight by himself." (Id. at 625.) Nowhere in its briefing does Shelby County argue that Edwards's request was unreasonable, and the county does not suggest that it would have resulted in undue hardship. Because the moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact[,]" Celotex, 477 U.S. at 323 (1986), and Shelby County makes no mention of this particular argument in its briefs, the court DENIES the motion for summary judgment as to Edwards's failure to accommodate her asthma claim.

Edwards also claims that Shelby County failed to reasonably accommodate her request for a schedule change when she was given a shift on October 5, 2021, which required her to drive at night. Again, the court finds that this request falls under a request for a modified work schedule and, therefore, a jury could find that it was objectively reasonable. Edwards was given

a new schedule on October 6, 2021, the next day, and only spent one day with a late shift, which she admits to having left early. (ECF No. 43-4 at PageID 587.) Even though Edwards alleges that the initial decision was made on October 5, and Suttle merely failed to inform her until the following day, no reasonable jury could find that Shelby County's actions were unreasonable. Edwards requested an accommodation and was immediately provided one. Therefore, the court GRANTS Shelby County's motion as to Edwards's failure to accommodate her night blindness, and this claim is DISMISSED WITH PREJUDICE.

4. Whether Shelby County has articulated legitimate, nondiscriminatory reasons for Edwards's termination

Returning to Edwards's disability discrimination claim, Shelby County argues that, even in the event that Edwards was disabled and it knew or should have known she had the conditions, it is still entitled to summary judgment on her wrongful termination claim because there were alternative reasons for Edwards's termination. An employer need only establish "some legitimate, nondiscriminatory reason" for the termination to satisfy its burden. McDonnell Douglas, 411 U.S. at 802. Between the DAF, Suttle's two reports, and the emails sent between the various SCHD employees, Shelby County has undoubtedly produced evidence sufficient to demonstrate legitimate, nondiscriminatory reasons for Edwards's termination.

These include alleged violations of COVID-19 protocols, as well as tardiness and absences at work. (ECF No. 43-27 at PageID 764–65.)

    5.    <u>Whether the stated reasons for Edwards's firing were a pretext for discrimination</u>

Once the defendant meets its burden of producing a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiff to demonstrate pretext. <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 562 (6th Cir. 2000). A plaintiff may meet her burden to demonstrate pretext by showing that the proffered reason "(1) [has] no basis in fact, (2) did not actually motivate [defendant's] action, or (3) [was] insufficient to warrant [the adverse] action." <u>Smyer v. Kroger Ltd. P'ship I</u>, No. 22-3692, 2024 WL 1007116, at *4 (6th Cir. Mar. 8, 2024) (citing <u>Redlin v. Grosse Pointe Pub. Sch. Sys.</u>, 921 F.3d 599, 612 (6th Cir. 2019) (quoting <u>Chen v. Dow Chem. Co.</u>, 580 F.3d 394, 400 (6th Cir. 2009))). "To survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." <u>Griffin v. Finkbeiner</u>, 689 F.3d 584, 593 (6th Cir. 2012) (quoting <u>Blair v. Henry Filters, Inc.</u>, 505 F.3d 517, 532 (6th Cir. 2007)).

To demonstrate pretext, a plaintiff "must put forth evidence which demonstrates that the employer did not 'honestly

believe' in the proffered non-discriminatory reason for its adverse employment action." Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001) (citing Smith v. Chrysler Corp., 155 F.3d 799, 806–807 (6th Cir. 1998)). Additionally, Edwards ultimately has the burden of showing that but-for the alleged discrimination, she would not have been terminated. Lewis, 681 F.3d at 321.

Shelby County argues that "there is no evidence that any of Ms. Edwards' superiors did not 'honestly believe' that she had subpar job performance." (ECF No. 38-2 at PageID 185–86.) To the contrary, Edwards has provided more than sufficient evidence from which a jury could conclude that Edwards's termination resulted from the alleged discrimination. "The key in assessing whether an employer had an honest belief is 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" Jones v. St. Jude Med. S.C., Inc., 504 F. App'x 473, 477 (6th Cir. 2012) (quoting Smith, 155 F.3d at 807). "An employer has an honest belief in its rationale when it 'reasonably relied on the particularized facts that were before it at the time the decision was made.'" Id. (quoting Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001)) (additional quotation marks and citation omitted). Until Edwards sought accommodations, there was no record that she was subject to discipline while working

at SCHD. (ECF No. 43-4 at PageID 583-84; ECF No. 43-5 at PageID 613.) In a matter of four days, Edwards was terminated. (ECF No. 38-1 at PageID 166; ECF No. 42-1 at PageID 443.) In that time, Suttle, apparently working alone, compiled two reports – alleging all sorts of behavior but largely lacking in substantiated facts – the first of which was sent to Kmet less than twenty-four hours after Edwards first disclosed her night blindness. (ECF No. 43-8 at PageID 717.) The second report included an anonymous witness statement about an alleged incident in August 2021 involving Edwards violating COVID-19 protocols. (ECF No. 43-7 at PageID 713.) No prior record had been made of the incident, yet this was listed as a reason for her termination in the DAF. (ECF No. 43-27 at PageID 764.) A reasonable jury could find that Suttle's involvement in every step of the termination process, the fact that the stated reasons in the DAF were almost entirely based on Suttle's own reports, and the speed at which the process was conducted, do not lend themselves to the decision having been "reasonably informed and considered[.]" Jones, 504 F. App'x at 477. A reasonable jury could also conclude that these actions, taken together, suggest that Suttle had unstated, discriminatory intentions when she sought to fire Edwards, and that these discriminatory intentions were the but-for cause of the ultimate termination.

- 53 -

The many listed incidents in the DAF and Suttle's reports, as described in the Findings of Fact, could all be legitimate reasons for her termination, but Edwards's extensive briefing and attached records in response to Shelby County's motion manage to assert a plausible, alternative explanation for each. It appears from the summary judgment record that the extent of Suttle's investigation into Edwards amounted to soliciting four emails primarily about criminal activity at the Econo Lodge, which a jury could find to be an insufficient investigation. (ECF Nos. 43-22, 43-23, 43-24, and 43-25.) Although there is undoubtedly evidence to support Shelby County's position, summary judgment is not in order. Therefore, the court DENIES Shelby County's motion as to Edwards's wrongful termination claim.

**D.   Edwards's Retaliation Claim**

Edwards's final claim under the ADA is retaliation. The court notes that Shelby County did not move for summary judgment on the retaliation claim in its opening brief. The retaliation claim is only briefly discussed in Shelby County's reply, and even there the argument is limited to generally asserting that "these issues have been discussed at length[.]" (ECF No. 44 at PageID 833.) Under these circumstances, the court is not inclined to grant summary judgment on the retaliation claim. In

any event, even on the merits, summary judgment is not warranted on this claim.

In order to present a *prima facie* case of retaliation, Edwards must establish that (1) she engaged in a protected activity under the ADA; (2) Shelby County knew of this activity; (3) Shelby County took adverse action against Edwards; and (4) there was a causal connection between the protected activity and the adverse action. A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013). Similar to an ADA discrimination claim, "to prevail on a retaliation claim, a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" Ford Motor Co., 782 F.3d at 770 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)).

First, the court finds that Edwards has presented sufficient evidence to establish a *prima facie* case that she engaged in a protected activity. Under the ADA, requests for accommodation are protected acts. Anderson v. Detroit Transp. Corp., 435 F. Supp. 3d 783, 798 (E.D. Mich. 2020) (citing A.C., 711 F.3d at 698). As discussed above, a reasonable jury could find that Edwards's requests for a day off for her asthma and to be scheduled to work during the day because of her night blindness were requests for accommodations. Also, as discussed above, there is sufficient evidence for purposes of summary

judgment to conclude that Shelby County was aware of Edwards's requests.

As to the fourth element, the court finds that Edwards has made a *prima facie* case that there was a causal connection between Edwards's request for accommodation and her termination. Although the court has found that Shelby County did accommodate Edwards's request for a different shift, Edwards has nonetheless provided sufficient evidence for a reasonable jury to conclude that she was retaliated against. As discussed in the previous section, the short timeline between Edwards's request and her termination, and the even shorter timeline between Edwards's request and Suttle's first report, creates a genuine issue as to whether Edwards's request to be accommodated was the but-for cause for her termination. Therefore, the court DENIES Shelby County's motion as to Edwards's retaliation claim.

### III. CONCLUSION

For the reasons stated above, Shelby County's motion for summary judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

June 12, 2024
Date